FILED
FEBRUARY 21, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. |
| ) | |
| FUNDS IN THE AMOUNT OF ) | **08 C 1071** |
| APPROXIMATELY FIVE MILLION ) | |
| DOLLARS ($5,000,000) ) | |
| INCLUDING: ) | **JUDGE BUCKLO** |
| ) | **MAGISTRATE JUDGE ASHMAN** |
| THE REAL PROPERTY LOCATED AT ) | |
| 57 SOUTH DEERE PARK DRIVE, ) | |
| HIGHLAND PARK, ILLINOIS, and ) | |
| ) | |
| THE REAL PROPERTY LOCATED AT ) | |
| 2494 BAY ISLE DRIVE, ) | |
| WESTON, FLORIDA ) | |
| ) | |
| Defendants. ) | **JURY TRIAL DEMANDED** |

**VERIFIED COMPLAINT FOR FORFEITURE**

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, for its verified complaint against the above-named defendant properties, alleges in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure as follows:

1. This complaint for forfeiture is verified by the attached affidavit of Special Agent Daniel W. Cain of the Federal Bureau of Investigation ("FBI"), which is fully incorporated herein.

**Jurisdiction and Venue**

2. This is an *in rem* forfeiture action brought pursuant to Title 18, United States Code, Section 981(a)(1)(C), for forfeiture of funds in the amount of five million dollars, to be satisfied by

proceeds from the sale of the real properties located at 57 South Deere Park Drive, Highland Park, Illinois, and 2494 Bay Isle Drive, Weston, Florida, more fully described below, which properties constitute and are derived from proceeds obtained from violations of Title 18, United States Code, Sections 1341, 1343, and 666. This court has jurisdiction over this action pursuant to Title 28, United States Code, Sections 1345 and 1355:

(a) The real property located at 57 South Deere Park Drive, Highland Park, Illinois ("Deere Park property"), legally described as:

PARCEL 1: LOTS 77 AND 78 IN BAIRD AND WARNER, INC. ADDITION TO DEERE PARK SUBDIVISION, BEING A SUBDIVISION OF THE SOUTHEAST 1/4 OF THE SOUTHWEST 1/4 AND THE SOUTHEAST FRACTIONAL QUARTER OF SECTION 31, TOWNSHIP 43 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, TOGETHER WITH LOTS 13 AND 14 IN HILL AND STONE'S RAVINE VIEW SUBDIVISION IN SAID SOUTHWEST 1/4 OF SECTION 31 IN THE CITY OF HIGHLAND PARK; ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 4, 1926 IN BOOK "Q" OF PLATS, PAGE 86, AS DOCUMENT 290930, (EXCEPT THAT PART OF SAID LOT 77 LYING NORTHERLY OF A LINE DRAWN PARALLEL WITH THE NORTHERLY LINE OF SAID LOT 77 AND 40 FEET SOUTH FROM THE NORTHERLY LINE AS MEASURED ALONG THE EASTERLY LINE OF DEERE PARK DRIVE SOUTHEAST, AND EXCEPT THAT PART OF LOT 78 AFORESAID LYING SOUTHERLY OF THE LINE DRAWN PARALLEL TO THE NORTHERLY LINE OF SAID LOT 78 AND 55 FEET SOUTHERLY THEREOF, AS MEASURED ALONG THE EAST LINE OF DEERE PARK DRIVE SOUTHEAST), IN LAKE COUNTY, ILLINOIS.

PARCEL 2: THOSE PARTS OF LOTS 1 AND 2 IN COHEN'S RESUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED AS DOCUMENT 1207747 ON NOVEMBER 18, 1963, LYING SOUTHERLY OF THE FOLLOWING DESCRIBED LINE BEGINNING ON THE WESTERLY LINE OF SAID LOT 1, 4.83 FEET NORTHERLY OF THE SOUTHWESTERLY CORNER THEREOF; THENCE EASTERLY ALONG A STRAIGHT LINE

200.81 FEET, MORE OR LESS, TO A POINT 7.70 FEET NORTHERLY OF THE POINT OF INTERSECTION OF THE SOUTHERLY LINE OF SAID LOT 2 WITH THE TOP OF BLUFF MEANDER LINE IN LOT 77 IN BAIRD AND WARNER, INC. ADDITION TO DEERE PARK SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED AS DOCUMENT 290930 ON DECEMBER 4, 1926; THENCE EASTERLY ALONG A LINE 7.70 FEET NORTHERLY OF AND PARALLEL WITH SAID SOUTHERLY LINE OF LOT 2 TO THE WATER'S EDGE OF LAKE MICHIGAN IN THE EAST QUARTER OF SECTION 31, TOWNSHIP 43 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, CITY OF HIGHLAND PARK, IN LAKE COUNTY, ILLINOIS.

Permanent real estate index number: 17-31-302-051-0000; and

(b)   The real property located at 2494 Bay Isle Drive, Weston, Florida ("Bay Isle Drive property"), legally described as:

LOT 44, BLOCK 6 OF SECTOR 7-PARCELS F,G,H, I, I-1, I-2, I-3, I-4, K-1 & K-2, ACCORDING TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 156, PAGE 23, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA.

Property folio number: 0913-03-1850.

3.   This court has *in rem* jurisdiction over the defendant properties pursuant to Title 28, United States Code, Sections 1355(b)(1)(A) and (d), as the acts giving rise to the forfeiture occurred within the Northern District of Illinois.

4.   Venue is proper under 28 U.S.C. § 1395(a) because this action accrued within the Northern District of Illinois in that conduct constituting the basis for this action occurred within the jurisdiction.

## Statutory Authority

5. This *in rem* forfeiture action is brought pursuant to Title 18, United States Code, Section 981(a)(1)(C).

## Specific Allegations

6. Beginning no later than in or about early 2001 and continuing through at least in or about June 2004, Stuart Levine ("Levine") and others fraudulently obtained and caused to be obtained for the benefit of himself and others multi-million dollar contracts through a series of kickbacks related to construction contracts, resulting in the diversion of assets from Chicago Medical School ("CMS"), and from Northshore Supporting Organization ("NSO"), a charitable trust established to support and operate for the benefit of CMS. The fraudulent transactions conducted in the course of the scheme include the following:

### Diversion of $3,000,000 From NSO and CMS

7. Beginning in or about the July 2002, Levine fraudulently diverted a total of $6 million from NSO by causing NSO to lend $3 million to a company controlled by Levine, and $3 million to a company controlled by Individual A, and by subsequently arranging to have both of those loans forgiven without repayment, as described more fully below.

8. Specifically, on or about July 19, 2002, Levine fraudulently caused NSO to lend $3 million to Levine's company, S.L. Investment Enterprises, L.P., and $3 million to a company controlled by Individual A. In connection with those loans, notes were executed on behalf of the companies requiring each company to repay the $3 million loan to NSO at the end of 20 years, with an interest rate of 7.5% per annum, resulting in each company owing approximately $12.5 million in 20 years.

9. Further, on or about December 1, 2002, Levine and Individual A each signed a promissory note agreeing to substitute as the borrower for their respective companies for the funds borrowed from NSO.

10. In his capacity as a member of the NSO Board of Trustees, Levine caused NSO to donate the two promissory notes to CMS on the condition that CMS immediately sell the promissory notes to Individual C for $1 million.

11. On or about January 9, 2003, Levine arranged to have the Chairman of the CMS Board of Trustees sign a document accepting the promissory notes as a donation, and another document agreeing to sell the promissory notes to Individual C for $1 million.

12. On or about January 31, 2003, Levine and Individual C caused a check for $1 million, drawn on an account belonging to Individual C, to be sent to Levine.

13. On or about February 3, 2003, Levine presented the check for $1 million to the President/CEO of CMS. In order to conceal the fraudulent nature of this transaction, Levine falsely represented to the President/CEO that the $1 million was a personal donation from Levine and Individual A. Levine failed to disclose to the President/CEO any information concerning the $6 million promissory notes, including the fact that Levine had previously arranged with the Chairman of the CMS Board of Trustees that the $1 million from Individual C would constitute Individual C's payment for the purchase of the NSO promissory notes.

14. After purchasing the promissory notes for $1 million, Individual C transferred the promissory notes to Levine and Individual A, respectively, as "gifts," thereby freeing Levine and Individual A from any obligation to repay the $3,000,000 that Levine and Individual A had each purported to borrow from NSO.

15. By means of this sequence of transactions, LEVINE fraudulently obtained and converted $3,000,000 to his personal use, and $3,000,000 to the use of his associate, Individual A.

16. The above described scheme to defraud CMS and NSO of money, property, and the intangible right of honest service by Levine was executed by Levine through means of materially false and fraudulent pretenses, representations, and promises. Furthermore, Levine, in furtherance thereof, used and caused the use of the United States mails and other interstate carriers, and interstate and foreign wires. Accordingly, the funds converted by Levine represent property which constitutes and was derived from proceeds traceable to violations of 18 U.S.C. §§ 1341, 1343, and 666.

**$2,000,000 in Kickbacks Relating to Various Contracts**

**CMS Addition**

17. In or about the summer of 2001, CMS wanted to build an addition to the Chicago Medical School. Levine instructed Jacob Kiferbaum, who owned a construction company called Kiferbaum Construction Company ("KCC") that was going to make a bid to build the CMS addition, to include in the KCC bid an extra $1 million as a kickback for Levine.

18. Levine and Kiferbaum, who were both on the CMS Board of Trustees, used their influence to cause CMS to award the construction contract for the CMS addition of approximately $18 million to KCC. Levine and Kiferbaum concealed from the CMS Board of Trustees the $1 million kickback that Kiferbaum had agreed to pay at Levine's direction. CMS eventually paid KCC for the construction of the CMS addition, which payments included the $1 million kickback that had been included in the original bid.

19. In order to conceal the fraudulent nature of the extra $1 million to be paid by CMS to Kiferbaum Construction Company, Levine directed Kiferbaum to pay the $1 million kickback to

a consulting company owned by John Glennon called North American Capital Opportunities, LLC ("NACO"), and Kiferbaum agreed to do so. In order to conceal the fraudulent nature of the payments to Glennon, Levine caused a sham marketing contract to be prepared, which was signed by Kiferbaum and Glennon in or about early December 2001. This contract provided that KCC would pay NACO $28,000 a month for approximately three years, for a total of approximately $1 million.

20.     Beginning in or about December 2001 and continuing through in or about June 2004, Glennon sent invoices requesting payment of $28,000 every month, despite the fact that Glennon and NACO did not provide any substantial services in exchange for those payments. Kiferbaum caused his company to pay NACO a total of approximately $700,000.

21.     In or about December 2003 or January 2004, Levine and Kiferbaum agreed that the balance that Kiferbaum still owed on the kickback relating to the CMS addition would be combined with kickback payments that Kiferbaum would make at Levine's direction relating to another project. Based on that agreement, Kiferbaum stopped paying NACO in approximately January 2004.

**CMS Student Housing**

22.     In or about the summer of 2002, CMS wanted to build new student housing. Levine instructed Kiferbaum to include in a KCC bid to build the CMS student housing an extra $1 million as a kickback for Levine.

23.     Levine and Kiferbaum again used their influence on the CMS Board of Trustees to cause CMS to award the construction contract for the CMS student housing of approximately $22 million to KCC. Levine and Kiferbaum concealed from the CMS Board of Trustees the $1 million kickback that Kiferbaum had agreed to pay at Levine's direction. CMS eventually paid KCC for the

7

construction of the CMS student housing, which payments included the $1 million kickback that had been included in the original bid.

24. In order to conceal the fraudulent nature of the extra $1 million to be paid by CMS to KCC, in or about December 2002, Levine directed Kiferbaum to pay this extra $1 million to Individual C, which Kiferbaum agreed to do.

25. On or about December 12, 2002, Kiferbaum caused his KCC to issue a check in the amount of $628,000, made payable to Individual C.

26. On or about March 13, 2003, Kiferbaum caused his company to issue a check in the amount of $372,000, made payable to Individual C.

27. In order to conceal the fraudulent nature of the payments made to Individual C, in or about March 2003, LEVINE caused a sham marketing contract to be prepared and sent to Kiferbaum. Although the contract stated that Individual C would provide services to KCC, no such services were ever provided.

28. Levine and Individual A each received a substantial financial benefit as a result of the $1 million kickback, as described above, in that, the $1 million that Individual C received from KCC was then used to purchase the $6 million in promissory notes from CMS.

29. On July 20, 2005, a superseding indictment was returned in the United States District Court in the Northern District of Illinois in the case *U.S. v. Stuart Levine, et al.*, 05 CR 408. The superseding indictment charged Stuart Levine and others with fraud, bribery, and extortion, in violation of 18 U.S.C. §§ 1343, 1346, and 666, among other violations.

30. On October 5, 2006, a superseding indictment was returned in the United States District Court in the Northern District of Illinois in the case *U.S. v. Stuart Levine, et al.*, 05 CR 691.

The superseding indictment charged Stuart Levine and others with fraud, bribery, and extortion, in violation of 18 U.S.C. §§ 1341, 1343, 1346, and 666, among other violations

31. On October 27, 2006, Levine entered a guilty plea to certain counts of the superseding indictment under case number 05 CR 691, charging him with violations of 18 U.S.C. §§ 1343 and 1346. Pursuant to the plea agreement, Levine agreed to relinquish all right, title, and interest he may have in certain property, namely the defendant funds in the amount of five million dollars because those funds are subject to forfeiture.

32. For the reasons stated herein and in the attached affidavit, there is probable cause to believe that funds in the amount of five million dollars, including the real properties located at 57 South Deere Park Drive, Highland Park, Illinois, and 2494 Bay Isle Drive, Weston, Florida, constitute and are derived from proceeds obtained from violations of mail fraud, wire fraud, and misapplication of funds, pursuant to the provisions of Title 18, United States Code, Sections 1341, 1343, and 666, and are therefore subject to forfeiture and condemnation pursuant to Title 18, United States Code, Section 981(a)(1)(C).

WHEREFORE, the United States of America requests:

A.  That the defendant properties be proceeded against for forfeiture and condemnation, that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed;

B.  That the court adjudge and decree that the defendant properties be forfeit to the United States and disposed of according to law; and

C.  The United States requests that any trial be before a jury.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: *[signature]*
CHRISTOPHER S. NIEWOEHNER
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-6117

State of Illinois      )
                       )   SS
County of Cook         )

## AFFIDAVIT

I, Daniel W. Cain, having first been duly sworn, upon oath, deposes and states as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to investigate various federal criminal law violations and have been so employed for approximately 21 years. As Special Agent with the FBI, I am an investigative and law enforcement officer of the United States, empowered by law to conduct investigations of, and to make arrests for, certain federal offenses. My duties include investigating alleged violations of Titles 18, United States Code, Section 1341, 1346, and 666.

2. I have read the complaint in this matter and the facts alleged are true and correct to the best of my knowledge, information, and belief based upon my own personal knowledge as well as information I have received from other agents, persons and documents. Because this affidavit is for a limited purpose of establishing that certain property is subject to forfeiture, it does not include each and every fact known to me concerning this investigation.

3. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 19th of February, 2008, in Chicago, Illinois.

_____
DANIEL W. CAIN
Special Agent
Federal Bureau of Investigation