EXHIBIT

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08 C 1071 |
| | ) | |
| FUNDS IN THE AMOUNT OF | ) | Judge Amy J. St. Eve |
| APPROXIMATELY FIVE MILLION | ) | |
| DOLLARS ($5,000,000) INCLUDING: | ) | |
| | ) | |
| THE REAL PROPERTY LOCATED AT | ) | |
| 57 SOUTH DEERE PARK DRIVE, | ) | |
| HIGHLAND PARK, ILLINOIS, and | ) | |
| | ) | |
| THE REAL PROPERTY LOCATED AT | ) | |
| 2494 BAY ISLE DRIVE, | ) | |
| WESTON, FLORIDA, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED CLAIM OF ASTORIA FEDERAL MORTGAGE CORPORATION

TO:    PLAINTIFF AND ITS ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that ASTORIA FEDERAL MORTGAGE CORPORATION ("ASTORIA") has a security interest in the defendant property commonly known as 57 South Deere Park Drive, Highland Park, Illinois (the "Property").

On or about March 18, 2008, STUART P. LEVINE and SHERRI H. LEVINE, husband and wife, executed and delivered to ASTORIA a "Fixed/Adjustable Rate Note" and certain Riders thereto (collectively referred to as the "Note") in the principal amount of One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00). A copy of the Note is attached hereto as Exhibit A and incorporated by reference. The Note was secured


EXHIBIT
1

by a Mortgage, a copy of which is attached hereto as Exhibit B and incorporated by reference.

WHEREFORE, ASTORIA hereby files this Verified Claim with this Court stating that it has an interest in the defendant Property to the extent of its lien as shown by the recorded mortgage or the actual amount of credit outstanding, including but not limited to the One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00) principal amount of the Note secured by the Mortgage and its costs and expenses, including its reasonable attorneys' fees, incurred to protect its interest in the Property as authorized under Paragraphs 9 and 14 of the Mortgage.

Respectfully submitted,
ASTORIA FEDERAL MORTGAGE
CORPORATION

By:    s/ W. Matthew Bryant
       One of its attorneys

Samuel H. Levine #06181160
Patrick J. Cotter #06202681
W. Matthew Bryant #06228918
ARNSTEIN & LEHR, LLP
Attorneys for Claimant
120 South Riverside Plaza
Suite 1200
Chicago, Illinois 60606
(312) 876-7100 phone
(312) 876-0288 facsimile

## VERIFICATION PURSUANT TO 28 U.S.C. 1746

The undersigned person verifies under penalty of perjury that he/she has read the foregoing Verified Claim of Astoria Federal Mortgage Corporation and that it is true and correct.

Executed on the __29__ day of April, 2008.

ASTORIA FEDERAL MORTGAGE
CORPORATION

By: _____

WALTER KRZYMINSKI

Title: _ASSISTANT SECRETARY_

3

EXHIBIT

A

*9814366*

# FIXED/ADJUSTABLE RATE NOTE
## INTEREST ONLY FOR 10 YEARS
### (LIBOR Index-Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

**BORROWER WILL MAKE MONTHLY PAYMENTS OF INTEREST ONLY FOR THE FIRST 120 MONTHS. (THE AMOUNT OF SUCH PAYMENTS IS SUBJECT TO CHANGE DUE TO THE FACT THAT THE INTEREST RATE WILL BECOME AN ADJUSTABLE INTEREST RATE IN ACCORDANCE WITH SECTION 4 BELOW.) BEGINNING WITH THE 121st PAYMENT, BORROWER WILL BE REQUIRED TO MAKE MONTHLY PRINCIPAL AND INTEREST PAYMENTS IN AN AMOUNT SUFFICIENT TO FULLY AMORTIZE THE UNPAID PRINCIPAL BALANCE AT THE MATURITY DATE.**

| 03/18/2005 | NORTHBROOK | ILLINOIS |
|---|---|---|
| [Date] | [City] | [State] |

57 SOUTH DEERE PARK, HIGHLAND PARK, ILLINOIS 60035
[Property Address]

## 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S $1,250,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **ASTORIA FEDERAL MORTGAGE CORP.**. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.   INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. My initial interest rate will be 5.250%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.   PAYMENTS

### (A)   Time and Place of Payments

I will make payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 1, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date which is called the "Maturity Date."

I will make my monthly payments at **2000 MARCUS AVENUE, LAKE SUCCESS, NEW YORK 11042** or at a different place if required by the Note Holder.

770064229          9814366



EXHIBIT
A

(B)    **Initial Monthly Payments of Interest Only**

Beginning on **May 1, 2005**, I will make 120 monthly payments of interest only (the "Interest-Only Period") on the unpaid balance of the Note. Until I make a Partial Prepayment or the interest rate adjusts as set forth herein, my payment shall be $ **5,468.75**.

(C)    **Subsequent Monthly Payments of Principal and Interest**

Beginning on **May 1, 2015**, I will be required to make monthly payments of principal and interest (the "Principal and Interest Period") in an amount sufficient to fully amortize the unpaid principal balance of the Note by the Maturity Date. The amount of my monthly payment may change every twelve (12) months based on changes on the unpaid balance and the current interest rate as determined under Section 4 of this Note.

4.    **ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A)    **Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **April, 2008** and on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change is called a "Change Date."

(B)    **The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C)    **Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Three and 000/1000** percentage points (3.000%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

During the Principal and Interest Period, as set forth in Section 3(C) above, on the first day of the month following a Change Date, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

INTONT2

**(D)   Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.250%** or less than **3.250%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding twelve months. My interest rate will never be greater than **11.250%**.

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all of the monthly payments due under the Note.

I may make a Full Prepayment or Partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a Partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. Any Partial Prepayment made during the Interest-Only Period set forth in Section 3(B) above will reduce the amount of my monthly payments. Any Partial Prepayment made during the Principal and Interest Period set forth in Section 3(C) above may reduce the amount of my monthly payments after the first Change Date following my Partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law which applies to this loan and which sets maximum loan charges is finally interpreted so That the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

INTONT3

7.    **BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A)    Late Charge for Overdue Payments**

    If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000%** of my overdue payment of principal and/or interest. I will pay this late charge promptly but only once on each late payment.

    **(B)    Default**

    If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C)    Notice of Default**

    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least thirty (30) days after the date on which the notice is mailed to me or delivered by other means.

    **(D)    No Waiver by Note Holder**

    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E)    Payment of Note Holder's Costs and Expenses**

    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

8.    **GIVING OF NOTICES**

    Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

    Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

INTONT4

9.   **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10.   **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11.   **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)   Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

INTONT5

(B) When my initial interest fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows.

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender shall also not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonable determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises this option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
STUART P. LEVINE                    -Borrower

_____ (Seal)
SHERI H. LEVINE                     -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

INTONT6

Loan No. 770064229

# LENDER'S NOTE RIDER

**I FURTHER COVENANT, PROMISE AND AGREE WITH THE NOTE HOLDER AS FOLLOWS:**

**1. PRINTED NOTE AND MORTGAGE AND THIS RIDER** - The Rider changes, adds to, or deletes, certain provisions of the printed Note. The printed Note and this Rider will at times collectively be called "The Note". I agree that the Mortgage protecting this Note, including the riders to such Mortgage, and this Rider, are all part of the Note. Whenever the Note differs or conflicts with this Rider, this Rider will control. The Note or this Rider cannot be changed, altered, modified, waived or terminated orally.

**2. BORROWER'S FAILURE TO KEEP PROMISES AND AGREEMENTS** – If my loan is a fixed rate loan, Section Section 6(C) of the printed Note is deleted. If my loan is an adjustable rate loan, Section 7(C) of the printed Note is deleted. If any event stated in Section 2 of the Lender's Mortgage Rider occurs, Note Holder may accelerate the normal maturity of the Loan and require that I pay immediately any and all sums I owe Note Holder (called "Immediate Payment in Full"). Prior to requiring Immediate Payment in Full, Lender will send to me, in the manner described in Section 15 of the Mortgage, a notice that states (i) the promise or agreement that I failed to keep or the default that has occurred; (ii) the action that I must take to correct the default; (iii) a date, at least 30 days from the date the notice is given, by which I must correct the default; (iv) that if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale; and (v) that I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and Mortgage, and to present any other defenses that I may have. Note Holder may also invoke any other remedies permitted by law, or any loan or other document I give in connection with the Loan. If Note Holder requires Immediate Payment In Full, Note Holder may, among other things, increase my interest rate as provided in this Rider and bring a lawsuit to take away all of my remaining rights in the Property and to have the Property sold. At this sale Note Holder or another person may acquire the Property. This is known as "foreclosure and sale".

**3. HIGHER INTEREST RATE AFTER DEFAULT**- The second paragraph of Section 2 of the printed Note is deleted. The interest rate required by Section 2 of the Note is the rate I will pay before any default which results in the Note Holder demanding Immediate Payment In Full as described above. However, if Note Holder demands Immediate Payment In Full as described above, I agree to pay interest at a rate of five (5) per cent per year in excess of the rate in effect on the Note from the date that I defaulted or failed to keep any promise or agreement contained in any loan or other document I give in connection with this Loan, but in no event in excess of the maximum legal default rate of interest permitted under any law specifically applicable to Note Holder and the Note and Mortgage. Such higher rate of interest will apply to all sums owed by borrower under the Note or Mortgage.

**4. LOAN CHARGES** – If my loan is a fixed rate loan, this Section is added to Section 5 of the Note. If my loan is an adjustable rate loan, this Section is added to Section 6 of the printed Note. Nothing contained in this Note nor any transaction relating to this Note shall be construed or shall operate either presently or prospectively to require me to pay interest at a rate that is greater than is lawful for me to contract for. Any credit or refund shall not cure or waive any default by me.

**5. TRANSFER OF NOTE AND MORTGAGE** - Note Holder may transfer the Note, and transfer or assign the Mortgage, and Note Holder's right, title and interest, in whole or in part, without notice and without my consent. If the (i) Federal National Mortgage Association (FNMA), (ii) the Federal Home Loan Mortgage Corporation (FHLMC), (iii) the Federal Home Loan Bank (FHLB), or (iv) any other entity other than an entity which is owned in whole or in part by Note Holder, an owner of Note Holder, or any successor to Note Holder or its owner, buys all or some of the Note Holder's rights, this rider will automatically be deemed void, in which event all the terms and conditions contained in the Note and Mortgage will be fully effective. The Note Holder, and any other party who buys any or all of Note Holder's rights, may, at any time, also terminate the effectiveness of this rider, or any part of this rider, by merely voiding same and notifying the Borrower to that effect, in which event the applicable terms and conditions of the Note or the Mortgage will be fully applicable. However, either FNMA, FHLMC, FHLB, Note Holder, or any assignee may reinstate any of the provisions of this rider at any time by notifying the Borrower to that effect, in which event such provision will be in full force and effect.

NOTERI1

6.  **EFFECT OF THIS RIDER** - Nothing contained in this Rider shall be construed as depriving Note Holder of any right or advantage available under the Note, the Mortgage, or any of the other loan documents, or under any applicable law, rule or regulation, but any provision in this document differing from the Note, Mortgage, other loan documents or any law, rule or regulation shall be construed as conferring additional, and not substitute, rights and advantages.  If I fail to comply with the promises and agreements I have made in this rider, you, the Note Holder can declare a default and avail yourself of all of the rights and remedies set forth in any of the loan documents.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in this Rider.

_____          3/18/05
STUART F. LEVINE                          03/18/2005

_____          3/18/05
SHERI H. LEVINE                           03/18/2005

_____          _____
                                          03/18/2005

_____          _____
                                          03/18/2005

NOTER12

**ASTORIA FEDERAL MORTGAGE CORP.**

### ADDITIONAL NOTE AND/OR CONSOLIDATION, EXTENSION AND MODIFICATION AGREEMENT ("CEMA") RIDER
#### Notice of Prepayment Penalty

## I FURTHER COVENANT, PROMISE AND AGREE TO THE FOLLOWING :

**1. Agreements About the Printed Note, Security Instrument, CEMA and this Rider** — This Rider makes certain changes and additions or deletions to the attached printed Note (the "Note") and/or CEMA (the "CEMA") evidencing the Loan I have promised to pay (the "Loan"), which is protected by a Mortgage or Deed of Trust (the "Security Instrument"). I agree that the provisions of the Security Instrument and of this Rider, are all part of the Note and/or the CEMA. Whenever the terms, conditions and promises contained in the Note and/or the CEMA differ or are in conflict with this Rider, the provisions of this Rider will control.

**2. Borrower's Payments Before They are Due; Prepayment Penalty** — I may pay all or any part of the principal amount due in advance at any time, which is called a "prepayment." A refinance or consolidation of this loan shall be deemed a prepayment. A modification of any of the terms of this loan shall also be deemed a prepayment. Any such refinance, consolidation or modification will be deemed a prepayment of the entire outstanding principal balance. *Any other provision of this Note and/or the CEMA notwithstanding*, if I make a prepayment at any time on or before the first (1st) anniversary of the closing date, I may have to pay a prepayment charge. I may prepay up to twenty percent (20%) of the outstanding principal balance of the Note without incurring any prepayment charges. If my prepayment(s) exceed(s) said twenty percent (20%), I will be required to pay a charge of one percent (1%) of the amount exceeding such twenty percent (20%).

Notwithstanding the above, I will not incur a prepayment penalty if the prepayment is pursuant to a bona fide sale of the property on or after six (6) months from the closing date, such sale to be documented as an arms-length transaction, as evidenced by a HUD-1 Settlement Statement or otherwise, to the satisfaction of the Note Holder.

**3. Note Holder's Right to Transfer Note, Security Instrument and/or CEMA; Effect on this Rider** Note Holder has the right to transfer the Note and/or the CEMA, including this Rider, and transfer or assign the Security Instrument, including any riders, and Note Holder's right, title and interest under the Note, the Security Instrument, and/or the CEMA, in whole or in part, without notice and without my consent. If the Federal National Mortgage Association (FNMA), the Federal Home Loan Bank (FHLB), or the Federal Home Loan Mortgage Corporation (FHLMC) buys all or some of the Note Holder's rights under the Note, the Security Instrument, and/or the CEMA, this Rider will automatically be deemed void and of no further force and effect, in which event all the terms and conditions contained in the Note, the Security Instrument, and/or the CEMA will be fully effective. The Note Holder, and any other party who buys any or all of Note Holder's rights, may, at any time, also terminate the effectiveness of this Rider or any part of this Rider by merely voiding same and notifying the Borrower to that effect, in which event the applicable terms and conditions of the Note, the Security Instrument, and/or the CEMA will be fully applicable. However, either FNMA, FHLMC, FHLB or Note Holder may reinstate any of the provisions of this Rider at any time by notifying the Borrower to that effect, in which event such provision will be in full force and effect.

**4. Captions** — The captions and titles of this Rider are for convenience only. They may not be used to interpret or define the terms of the Note and/or the CEMA, or of this Rider.

**5. Effect of this Rider** — Nothing contained in this Rider shall be construed as depriving Note Holder of any right or advantage available under the Note, the Security Instrument, and/or the CEMA, or any other loan documents, or under any applicable law, rule or regulation but any provision in this document differing from the Note, the Security Instrument, and/or the CEMA other loan documents or any law, rule or regulation shall be construed as conferring additional, and not substitute, rights and advantages. If I fail to comply with the promises and agreements I have made in this Rider, you can declare a default and avail yourself of all of the rights and remedies set forth in any of the loan documents.

INTONRi

BY SIGNING BELOW, or by signing the Note and/or the CEMA which makes reference to this Rider, I accept and agree to the promises and agreements contained in this Rider.

Date: March 18, 2005

_____ (Seal)
STUART P. LEVINE                    -Borrower

_____ (Seal)
SHERI H. LEVINE                     -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

INTONR2

EXHIBIT

B

Return To:
ASTORIA FEDERAL MORTGAGE
CORP.
2000 MARCUS AVENUE
LAKE SUCCESS, NY 11042

Prepared By:
ASTORIA FEDERAL MORTGAGE
CORP.

We certify that this is a true, correct, and
accurate copy of the original instrument
Chicago Title and Trust Company

By _____

[Space Above This Line For Recording Data]

# MORTGAGE

715418 slc
25023402

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated March 18, 2005
together with all Riders to this document.
(B) "Borrower" is
STUART P. LEVINE and SHERI H. LEVINE

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is
ASTORIA FEDERAL MORTGAGE CORP.
Lender is a Corporation
organized and existing under the laws of The State Of New York

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3014 1/01

-6(IL) (0010)
Page 1 of 15

VMP MORTGAGE FORMS - (800)521-7291
770064229          9814366


EXHIBIT
B

Lender's address is 2000 MARCUS AVENUE
LAKE SUCCESS, NEW YORK 11042
Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated March 18, 2005
The Note states that Borrower owes Lender one Million Two Hundred Fifty Thousand and
00/100ths                                                                    Dollars
(U.S. $ 1,250,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than April 1, 2035

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |
| [ ] Home Equity Rider | | |
| [x] AF Mortgage Rider | | |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, the following described property located in the County                                                                    [Type of Recording Jurisdiction]
of **LAKE**                                              [Name of Recording Jurisdiction]:

SEE ATTACHED SCHEDULE "A" LEGAL DESCRIPTION

Parcel ID Number: 17-31-302-051-163                which currently has the address of
57 SOUTH DEERE PARK                                                              [Street]
HIGHLAND PARK                                    [City], Illinois 60035            [Zip Code]
("Property Address"):

  TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
  BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
  THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
  UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
  1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



SUFFCO SERVICES        Fax:6314546930        Apr 17 2008 10:44        P. 16

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.  **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23.  **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.  **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25.  **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____            _____ (Seal)
                                     STUART P. LEVINE          -Borrower


_____            _____ (Seal)
                                     SHERI H. LEVINE           -Borrower


_____ (Seal)     _____ (Seal)
              -Borrower                             -Borrower


_____ (Seal)     _____ (Seal)
              -Borrower                             -Borrower


_____ (Seal)     _____ (Seal)
              -Borrower                             -Borrower

**STATE OF ILLINOIS,** COOK                                                County ss:

I, _The Undersigned_                    , a Notary Public in and for said county and

state do hereby certify that

**STUART P. LEVINE and SHERI H. LEVINE**

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this 18 th            day of March, 2005

My Commission Expires: _October 29th, 2008_

_____
Notary Public

```
"OFFICIAL SEAL"
Peggy Sandholm
Notary Public, State of Illinois
My Commission Expires October 29, 2008
```

Loan No. 770064229

# LENDER'S MORTGAGE RIDER

### I FURTHER COVENANT, PROMISE AND AGREE WITH THE LENDER AS FOLLOWS:

1. **Printed Note And Mortgage And This Rider; "Lender".** This Rider changes, adds to, or deletes, certain provisions of the printed Mortgage/Deed of Trust/Security Deed ("Mortgage" or "Security Instrument"). I agree that the Note referred to in this Mortgage, including the rider to such Note (collectively, the "Note"), and this Rider, are all part of the Mortgage. Whenever the Mortgage differs or conflicts with this Rider, this Rider will control. The term "Lender" includes any owner and/or holder of the Mortgage. This Mortgage and Rider cannot be changed, altered, modified, waived or terminated orally.

2. **Borrower's Defaults.** Sections 19 and 22 of the Mortgage are deleted. Any reference to Section 22 of the Mortgage is changed to refer to this Section 2. If any event stated below occurs, Lender may accelerate the normal maturity of the Loan and require that I pay immediately any and all sums I owe to Lender (called "Immediate Payment In Full").

Lender may also invoke any other remedies permitted by law, the Mortgage, the Note, and/or any other document I give in connection with the Loan, including the power of sale for the purpose of foreclosure by advertisement, by means of which Lender may take away all of my remaining rights in the Property and sell the Property at public auction.

If Lender requires Immediate Payment In Full, Lender may, among other things, increase my interest rate by five (5) per cent per year as provided in the Note, and bring a lawsuit to take away all of my remaining rights in the Property and to have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "foreclosure and sale". In any lawsuit for foreclosure and sale, Lender will have the right to collect all costs allowed by law, and other reasonable costs, expenses and attorney's fees. If Lender has required immediate payment in full, I understand that I have no right to have enforcement of the Mortgage discontinued.

Prior to requiring Immediate Payment in Full, Lender will send to me, in the manner described in Section 15 of the Mortgage, a notice that states (i) the promise or agreement that I failed to keep or the default that has occurred; (ii) the action that I must take to correct the default; (iii) a date, at least 30 days from the date the notice is given, by which I must correct the default; (iv) that if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment In Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale; and (v) that I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and Mortgage, and to present any other defenses that I may have.

MTGRJE1

3. **Foreclosure Search; Receiver, Foreclosure and Sale.** If I do not keep a promise and/or agreement I have made to Lender, Lender may, among other things, obtain a "foreclosure search" and/or refer this Loan to an attorney for collection. I give Lender the right to have a receiver appointed without giving notice to me and whether or not the value of the Property is worth more than the amount I owe on the Mortgage or this Rider. I will pay the Lender reasonable rent from the date any judgement of foreclosure is entered for as long as I occupy the Property, but this does not give me the right to occupy the Property. If there is a foreclosure and sale, I agree that all of the Property or any part of the Property that is affected by the Mortgage may be sold together as one parcel unless the Lender requests that the Property be sold in more than one parcel. Lender may exercise its option to require Immediate Payment In Full during any default regardless of any prior forbearance. If suit is brought to collect any amount due to the Lender, Lender shall be entitled to collect all reasonable costs, expenses and attorney's fees. Furthermore, if I am in default, I promise to pay all costs of collection including reasonable attorney fees, whether or not a lawsuit is commenced as part of the collection process. Costs shall include the cost of a foreclosure search. My obligation to pay attorney fees and collection and court costs will survive my default or the termination of the Note, this Mortgage or any other document I sign in connection with this loan, or the repayment of the Loan.

4. **Forfeiture.** Anything in the seventh paragraph of Section 11 of the Mortgage to the contrary notwithstanding, Lender may require immediate payment in full and/or enforce any and all of its rights if any such civil or criminal action or proceeding for forfeiture is begun and prior to the entry of such final and binding court ruling.

5. **Authorization.** If the Mortgagor is a corporation, the execution of this Mortgage has been duly authorized by its Board of Directors. If the Mortgagor is a partnership, limited partnership, limited liability company, limited liability partnership or other entity, the execution of this Mortgage has been duly authorized and consented to in accordance with the partnership agreement, operating agreement, or other applicable organizational document.

6. **Miscellaneous Proceeds.** The fourth and fifth paragraphs of Section 11 of the Mortgage are superseded by the provisions of this Section. If all or if only a part of the Property is taken, destroyed or reduced in value, the proceeds will be used to reduce the sums secured. If any of the proceeds remain after the amount I owe to Lender has been paid in full, the remaining proceeds will be paid to me. I will give Lender any and all assignments and other instruments required by Lender for the purpose of assigning the award or awards to the Lender free of any other right or claim of any kind or nature. If for a time after any property is taken the agency or authority delays making payment but instead pays interest, I will pay Lender the difference between the interest Lender receives and the interest I would owe under the Note.

7. **Borrower's Payments.** The provisions of Section 1 of the Mortgage notwithstanding, Lender, at its option, need not apply partial or incomplete payments, and may hold any partial or incomplete payments until Lender has actually received funds comprising a full and complete payment. Lender need not pay interest on unapplied funds regardless of whether interest on principal accrues as if all Periodic Payments had been paid when due.

8. **Mortgage Transfer.** Lender may transfer the Note, and transfer or assign the Mortgage, and Note Lender's right, title and interest, in whole or in part, without notice and without my consent. If the (i) Federal National Mortgage Association (FNMA), (ii) the Federal Home Loan Mortgage Corporation (FHLMC), (iii) the Federal Home Loan Bank (FHLB), or (iv) any other entity other than an entity which is owned in whole or in part by Lender, an owner of Lender, or any successor to Lender or its owner, buys all or some of the Lender's rights, this rider will automatically be deemed void, in which event all the terms and conditions contained in the Note and Mortgage will be fully effective. The Lender, and any other party who buys any or all of Lender's rights, may, at any time, also terminate the effectiveness of this rider, or any part of this rider, by merely voiding same and notifying the Borrower to that effect, in which event the applicable terms and conditions of the Note or the Mortgage will be fully applicable. However, either FNMA, FHLMC, FHLB, Note Holder, or any assignee may reinstate any of the provisions of this rider at any time by notifying the Borrower to that effect, in which event such provision will be in full force and effect.

MTGRIE2

**9. Rental Payments and Possession of the Property.** As additional protection for Lender, I give to Lender all of my rights to any rental payments from the Property. However, until Lender requires Immediate Payment In Full under Section 2 herein, or until I abandon the Property, I have the right to collect and keep those rental payments as they become due. I will not collect more than one (1) month's rent in advance without the Lender's written consent. I have not given any of my rights to rental payments from the Property to anyone else, and I will not do so without Lender's consent in writing. If Lender requires Immediate Payment In Full under Section 2 herein, or if I abandon the Property, then Lender, persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) Collect the rental payments including overdue rental payments, directly from the tenants; (B) enter on and take possession of the Property; (C) manage the Property; and (D) sign, cancel and change leases. I agree that if Lender notifies the tenants that Lender has the right to collect rental payments directly from the tenants under this Section 9 the tenants may make those rental payments to Lender without having to ask whether I have failed to keep my promises and agreements under this Mortgage. If there is a judgment for Lender in a lawsuit for foreclosure and sale I will pay to lender reasonable rent from the date the judgment is entered for as long as I occupy the Property. However, this does not give me the right to occupy the Property. All rental payments collected by Lender or by a receiver, other than the rent paid by me under this Section 9, will be used first to pay the costs of collecting the rental payments and of managing the Property. The balance, if any, will be used to reduce the amount that I owe to Lender under the Note and under this Mortgage. The costs of managing the Property may include receiver's fees, reasonable attorney's fees, and the cost of any necessary bonds. Lender and the receiver will be obligated to account only for those rental payments that they actually receive.

**10. Effect of this Rider.** Nothing contained in this Rider shall be construed as depriving Lender of any right or advantage available under the Note, Mortgage, or any of the other loan documents, or under any applicable law, rule or regulation, but any provision in this document differing from the Note, Mortgage, other loan documents or any law, rule or regulation shall be construed as conferring additional, and not substitute, rights and advantages. If I fail to comply with the promises and agreements I have made in this Rider, you, the Lender, can declare a default and avail yourself of all of the rights and remedies set forth in any of the loan documents.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in this Rider.

_____        3/18/05
STUART P. LEVINE                          _____
                                          03/18/2005

_____        3/18/05
SHERI H. LEVINE                           _____
                                          03/18/2005

                                          _____
                                          03/18/2005

                                          _____
                                          03/18/2005

                                                    MTGRIE3

## FIXED/ADJUSTABLE RATE RIDER
### INTEREST ONLY FOR 10 YEARS
#### (LIBOR Index-Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 18th day of March, 2005, and is incorporated into an shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to ASTORIA FEDERAL MORTGAGE CORP. ("Lender") of the same date and covering the property described in the Security Instrument and located at:

#### 57 SOUTH DEERE PARK, HIGHLAND PARK, ILLINOIS 60035

[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

BORROWER WILL MAKE MONTHLY PAYMENTS OF INTEREST ONLY FOR THE FIRST 120 MONTHS. (THE AMOUNT OF SUCH PAYMENTS IS SUBJECT TO CHANGE DUE TO THE FACT THAT THE INTEREST RATE WILL BECOME AN ADJUSTABLE INTEREST RATE IN ACCORDANCE WITH SECTION 4 BELOW.) BEGINNING WITH THE 121st PAYMENT, BORROWER WILL BE REQUIRED TO MAKE MONTHLY PRINCIPAL AND INTEREST PAYMENTS IN AN AMOUNT SUFFICIENT TO FULLY AMORTIZE THE UNPAID PRINCIPAL BALANCE AT THE MATURITY DATE.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

(A)    ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of 5.250%. The Note also provides for a change in the initial fixed rate to an adjustable rate, as follows:

4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A)    Change Dates

The initial interest rate I will pay will change to an adjustable interest rate on the first day of April, 2008 and on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change is called a "Change Date."

### (B)    The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in the Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C)    Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Three and 000/1000** percentage points (**3.000%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

During the Principal and Interest Period, as set forth in Section 3(C) above, on the first day of the month following the Change Date, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D)    Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **7.250%** or less than **3.250%**. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding twelve months. My interest rate will never be greater than **11.250%**.

### (E)    Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F)    Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

INTORD2

## B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1.  Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.  When Borrower's initial interest fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender shall also not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

INTORD3

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises this option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and conditions contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
STUART P. LEVINE                     -Borrower

_____ (Seal)
SHERI H. LEVINE                      -Borrower

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

Page 4 of 4

INTORD4

 # CHICAGO TITLE INSURANCE COMPANY

**ORDER NUMBER:** 1409  000715418 SK
**STREET ADDRESS:** 57 S. DEERE
**CITY:** HIGHLAND PARK        **COUNTY:** LAKE
**TAX NUMBER:** 17-31-302-051-0000

LEGAL DESCRIPTION:

PARCEL 1:  LOTS 77 AND 78 IN BAIRD AND WARNER, INC. ADDITION TO DEERE PARK
SUBDIVISION, BEING A SUBDIVISION OF THE SOUTHEAST 1/4 OF THE SOUTHWEST 1/4 AND
THE SOUTHEAST FRACTIONAL QUARTER OF SECTION 31, TOWNSHIP 43 NORTH, RANGE 13,
EAST OF THE THIRD PRINCIPAL MERIDIAN, TOGETHER WITH LOTS 13 AND 14 IN HILL AND
STONE'S RAVINE VIEW SUBDIVISION IN SAID SOUTHWEST 1/4 OF SECTION 31 IN THE CITY
OF HIGHLAND PARK, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 4, 1926 IN
BOOK "Q" OF PLATS, PAGE 86, AS DOCUMENT 290930, (EXCEPT THAT PART OF SAID LOT 77
LYING NORTHERLY OF A LINE DRAWN PARALLEL WITH THE NORTHERLY LINE OF SAID LOT 77
AND 40 FEET SOUTH FROM THE NORTHERLY LINE AS MEASURED ALONG THE EASTERLY LINE OF
DEERE PARK DRIVE SOUTHEAST, AND EXCEPT THAT PART OF LOT 78 AFORESAID LYING
SOUTHERLY OF THE LINE DRAWN PARALLEL TO THE NORTHERLY LINE OF SAID LOT 78 AND 55
FEET SOUTHERLY THEREOF, AS MEASURED ALONG THE EAST LINE OF DEERE PARK DRIVE
SOUTHEAST), IN LAKE COUNTY, ILLINOIS.

PARCEL 2:    THOSE PARTS OF LOTS 1 AND 2 IN COHEN'S RESUBDIVISION ACCORDING TO THE
PLAT THEREOF RECORDED AS DOCUMENT 1207747 ON NOVEMBER 18, 1963, LYING SOUTHERLY
OF THE FOLLOWING DESCRIBED LINE BEGINNING ON THE WESTERLY LINE OF SAID LOT 1,
4.83 FEET NORTHERLY OF THE SOUTHWESTERLY CORNER THEREOF; THENCE EASTERLY ALONG A
STRAIGHT LINE 200.81 FEET, MORE OR LESS, TO A POINT 7.70 FEET NORTHERLY OF THE
POINT OF INTERSECTION OF THE SOUTHERLY LINE OF SAID LOT 2 WITH THE TOP OF BLUFF
MEANDER LINE IN LOT 77 IN BAIRD AND WARNER, INC. ADDITION TO DEERE PARK
SUBDIVISION ACCORDING TO THE PLAT THEREOF RECORDED AS DOCUMENT 290930 ON
DECEMBER 4, 1926; THENCE EASTERLY ALONG A LINE 7.70 FEET NORTHERLY OF AND
PARALLEL WITH SAID SOUTHERLY LINE OF LOT 2 TO THE WATER'S EDGE OF LAKE MICHIGAN
IN THE EAST QUARTER OF SECTION 31, TOWNSHIP 43 NORTH, RANGE 13, EAST OF THE
THIRD PRINCIPAL MERIDIAN, CITY OF HIGHLAND PARK, IN LAKE COUNTY, ILLINOIS.